**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**  :

    **v.**  :  **CRIMINAL NO. 07-677-01**

**MICHAEL DELBUONO**  :

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Michael DelBuono seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the fact that DelBuono's medical condition -- asthma – has been well controlled with treatment in BOP custody; moreover, while DelBuono has served approximately 70% of his sentence on the instant offense, he must still serve an additional 12 months' consecutive incarceration on sentences imposed in two other federal cases.

## I. Background.

### A. Criminal Conduct.

On approximately a dozen occasions from June 2007 through October 2007, DelBuono and his co-conspirators sold bundles of heroin to an undercover officer in the area of 7th and Wharton Streets in South Philadelphia. Each bundle contained approximately 13 small bags of heroin; in total, DelBuono and his co-conspirators sold more than 1,000 such bags of heroin, with a total weight of 32.48 grams. PSR ¶¶ 12-52.

DelBuono was the leader of this heroin-distribution conspiracy. He controlled the "stash house" used to store the heroin and drug proceeds. He was responsible for receiving the drugs from his suppliers, and he made sure the drugs were available for pick-up by the street-level dealers before each transaction. DelBuono also determined the amount of heroin available for sale, as well as the sale price per bundle. In addition, DelBuono orchestrated some of the street-level sales himself. PSR ¶ 53.

DelBuono committed these offenses while on federal supervised release and on New Jersey state parole. Indeed, DelBuono was released from custody on June 21, 2007, and the first transaction charged in the indictment occurred less than one week later, on June 27, 2007. Moreover, DelBuono committed these offenses in South Philadelphia, despite being required by the terms of his federal supervised release and his New Jersey state parole to restrict his travel to New Jersey.

On October 31, 2007, a grand jury in the Eastern District of Pennsylvania returned a 12-count indictment charging DelBuono and his co-conspirators with the drug offenses. On November 30, 2007, the government filed an Information pursuant to 21 U.S.C. § 851, to establish prior drug felony convictions. On March 31, 2008, DelBuono pled guilty before the Honorable Norma Shapiro to

the charges against him in the indictment, in an "open" plea (i.e., there was no plea agreement). [1]

Prior to the sentencing hearing, the United States Probation Officer prepared the PSR. Concerning DelBuono's physical condition, the PSR noted, "The defendant reportedly suffers from asthma, which is treated with an inhaler as needed. He described his asthma as more severe in his childhood, at which time [it] was treated with daily medication." PSR ¶ 110.

On August 13, 2008, Judge Shapiro sentenced DelBuono to 230 months' incarceration, to be followed by six years of supervised release. [2]

---

[1] DelBuono's conviction in this case constituted a violation of supervised release in two earlier federal heroin distribution cases, Cr. No. 01-458 and Cr. No. 04-684. In Cr. No. 01-458, on September 9, 2008, the district court (the Honorable Petrese B. Tucker) sentenced DelBuono to 12 months' incarceration, to be served consecutively to his sentence in this case. In No. 04-684, on August 26, 2008, the district court (the Honorable Michael M. Baylson) sentenced DelBuono to 12 months' incarceration, to be served consecutive to DelBuono's sentence in this case, and 24 months' supervised release. DelBuono did not appeal from either of these orders.

DelBuono's conviction in this case also constituted a violation of his New Jersey state parole in an Ecstasy distribution case, Superior Court of Cape May County, No. 1044-001. However, no further proceedings were held in that matter before DelBuono's term of parole expired, and the case is closed.

[2] The Probation Office calculated that DelBuono's guideline range was 188 to 235 months' imprisonment, as follows. The base offense level for offenses involving at least 20 grams but less than 40 grams of heroin was 18. This was increased by 4 levels because DelBuono was a leader and organizer of the conspiracy, resulting in an adjusted offense level subtotal of 22. However, DelBuono had several prior drug trafficking convictions and so was deemed a career offender, and therefore the base offense level was increased from 22 to 34 pursuant to USSG § 4B1.1(b)(B). With a three-level reduction for acceptance of responsibility, the final offense level was 31. PSR ¶¶ 66-79. As a result of his

DelBuono, age 45, is serving his sentence at FCI Danbury, with an anticipated release date of October 16, 2025.[3] This anticipated release date reflects the combined term for the sentence imposed for the instant offenses and the sentences imposed upon revocation of supervised release in DelBuono's two earlier federal cases noted above, and it also reflects anticipated good time credit.

In federal custody on this offense since October 4, 2007, DelBuono has had three disciplinary infractions: in 2008, he committed a code 398 violation (interference with staff in the performance of duties); in 2012, he committed a code 325 violation (giving or accepting money or anything of value to/from another inmate); and in 2014, he again committed a code 325 violation.

---

convictions for prior offenses, DelBuono had 9 criminal history points, to which 2 additional points were added because he committed the instant offenses while under a prior criminal justice sentence (supervised release and parole), and to which 1 additional point was added because he committed the offense less than two years after his release from custody on his prior offense (indeed, less than two weeks). With a total of 12 criminal history points, DelBuono was in criminal history category V (10, 11, or 12 points); however, as a career offender, he was automatically in criminal history category VI. With a 31/VI, his guideline range was 188 to 235 months' incarceration. PSR ¶ 125.

The Section 851 notice had the effect of increasing the statutory maximum sentence, but not imposing a mandatory minimum sentence. Because it increased the statutory maximum sentence, it also had the effect of increasing the offense level from 22 to 34. USSG § 4B1.1(b)(B).

[3] As noted above, this date reflects the award of anticipated good time credit. Absent the award of good time credit, DelBuono's full term on all three sentences would not expire until December 2, 2028. Accordingly, as of May 18, 2020, DelBuono has served 69.9% of his statutory term (i.e., assuming the award of good time credit), and 59.6% of his full term.

###   B.     Request for Compassionate Release.

On May 11, 2020, DelBuono (through counsel) filed a Motion to Reduce Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 295), asking this Court to reduce his sentence to release him from FCI Danbury.[4]  In his motion, DelBuono contends that he has asthma, recognized as a COVID-19 risk factor, and further contends that the conditions at FCI Danbury prevent social distancing. Thus, DelBuono asserts that "the danger of Covid-19 both to the prison system as a whole and to Mr. DelBuono in particular are 'extraordinary and compelling reasons for relief.'"  Doc. 295, p. 5. DelBuono additionally argues that while in prison he has dedicated himself to his rehabilitation, has received various commendations, and has taken various educational programs and worked in a Unicor manufacturing job. Doc. 295, p. 5. DelBuono also contends that he has served a significant portion of his sentence. Doc. 295, p. 1. For all of these reasons, he asks this Court to grant him release.

The government has obtained DelBuono's medical records from the BOP, and has provided a copy to defense counsel. These records are appended to this

---

[4]  DelBuono has attached a letter dated April 6, 2020, to Warden Diane Easter at FCI Danbury, requesting release to home confinement or compassionate release under 18 U.S.C. § 3582(c)(1)(A). The government has contacted BOP, which has advised that FCI Danbury has no record of this request. Nonetheless, the government will credit DelBuono's claim and not raise an exhaustion argument.

response, with a motion to seal, as Attachment A. As discussed below, these records reveal that DelBuono's asthma is well controlled at BOP.

DelBuono's most recent clinical encounters in the BOP were on March 31, 2020, for an eye exam, and prior to that, on November 15, 2019, over six months ago, for a "Chronic Care" evaluation. The absence of recent visits suggests his health is fine. At the November 2019 clinical encounter, DelBuono reported a childhood history of asthma. He was given an Albuterol inhaler to use as needed, and replace when empty. See Attachment A, pp. 2-5. An Albuterol inhaler has 200 puffs. If used at the maximum dosage of 2 puffs 4 times a day, it would last 25 days. DelBuono has not been back to replace it. Moreover, during DelBuono's checkup on November 15, 2019, he had two key tests related to asthma: his SaO2 (oxygen saturation) was measured at 99% (excellent), and his Wright peak flow results were 550 (apparently approximately within normal limits).[5]  Attachment A, pp. 2, 3.

---

[5]  As explained on webmed.com, "The peak flow meter works by measuring how fast air comes out of the lungs when you exhale forcefully after inhaling fully. This measure is called a 'peak expiratory flow,' or 'PEF.'" https://www.webmd.com/asthma/guide/peak-flow-meter  For a 45-year-old, 6'3" male, a PEF of 653 is a normal value, and readings up to 100 min/L lower than predicted are within normal limits. https://www.haag-streit.com/fileadmin/Clement_Clarke/Peak_Expiratory_Flow/Airzone/Peak-Flow-Rate-Chart.pdf. According to the British Lung Foundation: "Peak expiratory flow (PEF) is measured in litres per minute. Normal adult peak flow scores range between around 400 and 700 litres per minute . . . . The most important thing is whether your score is normal for you. Health care professionals will be looking to compare your scores over time, to see if your results are going up or down." https://www.blf.org.uk/support-for-you/breathing-tests/peak-flow  As indicated in the British Lung Foundation's chart in the referenced web page, the higher

The medical records for the November 2019 visit also reveal that DelBuono

had no wheezing or shortness of breath. The records state in relevant part:[6]

> This patient arrived to MDC Brooklyn, NY on 11/06/2019. He is 45 Y.O.
> obese man with H/O [history of] asthma from childhood [no ICU
> admission/intubation for asthma as an adult as per IM] on albuterol as
> needed. . . .
>
> Today his blood pressure is WNL [within normal limits] and he denies
> chest pain, SOB [shortness of breath], wheezing, coughing . . . .
>
> Will keep him on his medication . . . and will F/u [follow up] him as needed
> or in CCC [chronic care clinic].
>
> BMI #30.6[7]

Attachment A, p. 2.

Notably, a BOP Inmate Intra-system Transfer record from October 25,

2019, stated, under medications:

> Albuterol Inhaler HFA (8.5 GM) 90 MCG/ACT  Exp: 01/25/2020  *SIG:
> Don't use daily.* Inhale 2 puffs by mouth 4 times a day as needed to
> prevent/relieve asthma attack (inhaler to last 90 days. If need more, make
> sick call)  "Empty container is to be returned for refill"

---

flows were normal for taller men.

[6] Translations of abbreviations, e.g., "shortness of breath" for SOB, are the
undersigned's assumptions.

[7] The CDC states that "those at high-risk for severe illness from COVID-19
are ... [p]eople of all ages with underlying medical conditions, particularly if not
well controlled, including ... [p]eople with severe obesity (body mass index [BMI]
of 40 or higher)."  (Emphasis in original.)
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-
higher-risk.html  On November 6, 2019, BOP noted that DelBuono is 75 inches
tall (6'3") and 245 pounds. Attachment A, p. 36. Thus, with a body mass index of
30.6, DelBuono's weight is not a risk factor, nor does DelBuono contend that it is.

Attachment A, p. 31 (emphasis added). Medical notes from February 2016 and March 2011 stated, "Patient should be classified as Reactive Airway Disease – has not needed inhaler in >6 months." Attachment A, p. 42. In short, DelBuono's asthma is, and has been, successfully managed by BOP, and is not a significant ailment.

### C.   BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak

overseas." Id. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to

500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be

codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 2,841 inmates to home confinement; an increase of 99.6 percent of the number who would have been eligible in the ordinary course during the same period.

BOP's efforts at FCI Danbury are consistent with the national plan. In *Martinez-Brooks, et al v. Easter*, Civil No. 2020-569, a response filed by the government in the District of Connecticut on May 6, 2020, appended as Attachment B,  summarized steps that FCI Danbury has taken to address the COVID-19 crisis:

> Since first learning of COVID-19, BOP has instituted a multi-step action plan and taken extensive measures to mitigate the risks COVID-19 poses throughout its inmate population, including with respect to the inmate population at FCI Danbury. As set forth above, those measures include providing inmate and staff education; strict limitations of movement within FCI Danbury; suspension of most visits to FCI Danbury; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures. Additionally, FCI Danbury implemented the "modified operations" directive in a number of ways to reduce the spread of COVID-19 among inmates, including: (1) meals are brought to inmates in their respective housing dormitories; (2) providing health services within unit for routine medical issues, and allowing only inmates from the same units, who are sheltering in place together, to be in the same area for medical visits and pill lines; (3) inmates are all provided masks and are required to wear them, or be subject to discipline; and (4) extensive cleaning and sanitizing measures are taking place within FCI Danbury.[8]

---

[8] Additionally, according to the civil filing, each inmate's temperature is

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, many inmates at various institutions have become ill, and more likely will in the weeks ahead. There was one inmate death at Danbury, and recent testing suggests that dozens of inmates have tested positive.[9] As recounted in the recent litigation, BOP has taken aggressive steps to isolate inmates who are symptomatic or test positive. All other inmates at the FCI, including DelBuono, are kept in their housing units, subject to the rigid procedures described above designed to mitigate the spread of the illness.

BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety

---

taken daily and all staff are monitored daily before beginning their shift. All employees wear masks, and when appropriate personal protective equipment.

[9] As reported on https://www.bop.gov/coronavirus/ as of May 19, 2020, at FCI Danbury, 34 inmates and 3 staff have tested positive for the virus; there has been 1 inmate death and 0 staff deaths; and 48 inmates and 57 staff have recovered from the virus. There are 699 inmates at FCI Danbury, a low-security federal correctional institution, 158 inmates at the adjacent low security satellite prison, and 115 inmates at the minimum security satellite camp.

and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.   Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. See *Dillon v. United States*, 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

1. Extraordinary and Compelling Reasons.— Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A)   Medical Condition of the Defendant.—

    (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)   The defendant is—

        (I)   suffering from a serious physical or medical condition,

        (II)   suffering from a serious functional or cognitive impairment, or

        (III)   experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   Family Circumstances.—

> (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

At the present time, it is apparent that, but for the COVID-19 pandemic, DelBuono would present no basis for compassionate release. DelBuono is in good health and his medical ailment, asthma, does not present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes that assessment. The government acknowledges that, where an inmate suffers from a condition that the CDC recognizes as a risk factor for a more severe outcome from COVID-19, the risk of COVID-19 then presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A),

as, due to his comorbidities, such a defendant may be less able to protect himself against an unfavorable outcome from the disease.

The CDC recognizes "moderate to severe asthma" as a risk factor. These are terms of art. The National Asthma Education and Prevention Program describes moderate persistent asthma as present if any of the following is true:

> Symptoms occur daily. Inhaled short-acting asthma medication is used every day.

> Symptoms interfere with daily activities.

> Nighttime symptoms occur more than 1 time a week, but do not happen every day.

> Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

*See* https://www.uofmhealth.org/health-library/hw161158. There is no evidence that any of that applies to DelBuono, and indeed the medical records, showing minimal use of an inhaler and asymptomatic test results, suggest otherwise.[10] Accordingly, DelBuono does not present any "extraordinary or compelling reason" which is required by statute to justify compassionate release.

---

[10] The BOP maintains medical records listing diagnoses using codes from the International Statistical Classification of Diseases and Related Health Problems ("ICD"). In DelBuono's medical records, under "Resolved," in 2008, the BOP coded Mr. DelBuono's asthma as ICD-9 code 493.9 ("Resolved/Remission"). Attachment A, p. 42. Under "Current," in 2016, BOP coded Mr. DelBuono's asthma as ICD-10 code J45.909, which reflects "unspecified" asthma. This is consistent with what is apparent in the records, that asthma has not been a significant ailment for DelBuono in his adult years.

Even if he did, DelBuono still would not be entitled to relief. In that event, this Court must consider all pertinent circumstances, including the 3553(a) factors. At present, his medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, DelBuono's history of drug trafficking, and his immediate resumption of drug trafficking upon his release from prison in 2008, required a sentence that reflected the severity of the offense and the need to promote respect for the law, as well as to protect the public from the dangers of heroin in which DelBuono so readily trafficked.

A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, DelBuono's managed medical condition, and the amount of time remaining on his sentence – which includes a year of consecutive imprisonment on two other federal cases in which DelBuono's conduct in committing the instant offenses constituted a violation of supervised release.

To date, courts have generally granted compassionate release based on the threat of COVID-19 where the inmate suffers from significant ailments, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. See, e.g., *United States v. Gileno*, 2020 WL 1916773, at *5 (D. Conn.

Apr. 20, 2020) (62-year-old has asthma and other ailments, serving one-year sentence); *United States v. Curtis*, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (defendant suffers from MS, has lost 85% of his vision, and cannot conduct activities of daily living; further, his life sentence would be far shorter under current law).

Court have generally denied release in circumstances comparable to the defendant's, and in some instances where the defendant presented more serious health issues than those presented here. *See, e.g., United States v. MacKenzie*, 2020 WL 2104786 (D. Mass. May 1, 2020) (61-year-old defendant has served 2/3 of 144-month RICO sentence; "defendant has not shown that he is at materially greater risk of infection than any other incarcerated person. He states that he is at elevated risk because he suffers from high blood pressure and rhinitis (nasal congestion); however, both conditions appear to be effectively controlled with medication, and neither, as of this writing, has been identified as a risk factor for COVID-19 complications"; also denied based on criminal history); *United States v. Washington*, 2020 WL 1969301 (W.D.N.Y. Apr. 24, 2020) (a "generalized claim of asthma, without more, is not a sufficiently extraordinary and compelling reason for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)"; in addition, the defendant has served only 18 months of a 121-month sentence for drug crimes); *United States v. Condon*, 2020 WL 2115807 (D.N.D. May 4, 2020) (defendant has served about half of 180-month drug sentence; is 61 and suffers from asthma, COPD, cardiovascular disease, hepatitis C, hypertension, and hidradenitis

suppurativa (an inflammatory skin disease that is frequently described as an auto-immune disorder), but there are no cases at the facility and no showing she would be safer in the community); *United States v. Gold*, 2020 WL 2197839 (N.D. Ill. May 6, 2020) (two years remaining on 75-month fraud sentence; defendant is 65, with pre-emphysema, high blood pressure, and high cholesterol, conditions that "are common and do not appear to be among those the CDC has identified as significant risk factors"; in addition, there are no cases at Terre Haute); *United States v. Mazur*, 2020 WL 2113613 (E.D. La. May 4, 2020) (defendant has 6 months remaining on 24-month term for firearms offenses; risk presented at Butner Medium, which had an outbreak, along with defendant's conditions of myeloid leukemia and hypertension, do not present an extraordinary and compelling basis for relief, given BOP's efforts to address the issues); *United States v. Moskop*, 2020 WL 1862636 (S.D. Ill. Apr. 14, 2020) (72-year-old inmate "has suffered or suffers from various acute and chronic conditions including depression, high blood pressure, high cholesterol, an enlarged prostate, hearing loss, kidney disease, bleeding on the brain, and mental deterioration," but has served less than half of a 240-month sentence for serious fraud, and is at no particular enhanced risk from COVID-19); *United States v. Shah*, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) (defendant suffers from diabetes and hypertension, but there are no cases at his facility, and BOP is making efforts to protect inmates). Because the defendant fails to present

sufficient compelling and extraordinary reasons required by statute, his motion

for compassionate release should be denied.[11]

<div style="margin-left: 40%;">

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Karen L Grigsby*
KAREN L. GRIGSBY
Assistant United States Attorney

</div>

---

[11]  If this Court elects to grant a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

> Robert Gamburg, Esquire
> 1500 John F. Kennedy Blvd, suite 1203
> Philadelphia, PA  19102
> robert@gamburglaw.com


> */s Karen L. Grigsby*
> KAREN L. GRIGSBY
> Assistant United States Attorney

Dated:  May 19, 2020.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 07-677-1** |
| **MICHAEL DELBUONO** | **:** | |

## <u>ORDER</u>

AND NOW, this            day of May, 2020, upon consideration of the

defendant's Motion for Release from Custody Pursuant to 18 U.S.C.

§ 3582(c)(1)(A)(i) (docket no. 295), and the government's response to that

motion, it is hereby

ORDERED

that the defendant's motion is denied, for the reasons stated in the government's

response.

BY THE COURT:

_____

HONORABLE GENE E. K. PRATTER
*Judge, United States District Court*