## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DIANTHE MARTINEZ-BROOKS, REJEANNE COLLIER, JACKIE MADORE, and KENNETH CASSIDY, individually and on behalf of all others similarly situated, <br>   Petitioners, <br><br>        v. <br><br> D. EASTER, Warden of Federal Correctional Institution at Danbury, and MICHAEL CARVAJAL, Director of the Federal Bureau of Prisons, in their official capacities, <br>   Respondents. | No. 3:20-cv-00569 (MPS) <br><br><br> **DECLARATION OF DIANE EASTER** |

    I, DIANE EASTER, hereby make the following declaration:

### A.  Personal Background

1.  I am currently employed by the Federal Bureau of Prisons (BOP) of the United States Department of Justice, as Warden of the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"). I assumed this position in February 2020.

2.  I began my career with the BOP in December 1990 as an Administrative Assistant in the BOP's Montgomery (AL) Community Corrections Office. Since then I have been selected to serve in positions of increasing responsibility within BOP to include Case Manager in the BOP's Residential Reentry Office in Atlanta, Georgia in August, 1994; Case Manager at both the Federal Prison Camp and U.S. Penitentiary in Atlanta, Georgia in June 2001; Case Manager in the BOP's Southeast Regional Office in March, 2006; Community Corrections Specialist in the BOP's Southeast Regional Office in October, 2010; Assistant Sector Administrator in the BOP's Central Office in Washington, D.C. in (June/2013), physical location North Central Regional Office; Associate Warden at FCI Milan (MI) in March 2016; and Associate Warden at USP Big Sandy (KY) in April 2018.

**B. Structure of FCC Danbury Currently**

3. Activated in 1940, FCI Danbury is a comprised of three separate and distinct federal correctional institutions. FCI Danbury only houses sentenced offenders.

4. There are currently 264 staff employed at FCI Danbury.

5. The Federal Correctional Institution ("FCI" or "Main Complex") is a low security facility with a double-fenced perimeter, mostly dormitory or cubicle housing, with strong work and program components. The FCI has seven units that are open dorm style, two television rooms, one area for TRULINCS (email) stations, and two rooms that can house ten to twelve inmates each. The showers and bathrooms are communal. Two units have two-man cells with a toilet and sink in the cell, they have communal showers, an area for television and an area for phones. One unit has two-man cells, has communal showers and bathrooms, an area for television, area for telephones, and an area for groups. The main complex, the Camp, and the FSL are separate facilities, and the inmate populations do not interact. The staff-to-inmate ratio in an FCI is higher than in minimum security facilities. As of May 4, 2020, FCI Danbury houses 719 male offenders. The rated capacity of FCI Danbury is 554. The "rated capacity" is not a figure which represents the maximum number of inmates that can be designated to FCI Danbury.

6. The Federal Prison Camp ("FPC" or "Camp") is a minimum security institution which has dormitory housing, a relatively low staff-to-inmate ratio, and no perimeter fencing. As of May 4, 2020, FPC Danbury houses 134 female offenders. The rated capacity of the FPC is 146. The "rated capacity" is not a figure which represents the maximum number of inmates that can be designated to FPC Danbury. The Camp is a large building divided into four dormitories, each consisting of cubicles and bunk beds. Each dormitory has its own shower and bathroom area. There are two areas for watching television, one area for Skype visiting and an area for phones. The recreation facilities are down a hill at the rear of the FPC, and consists of a walking track and a building with exercise equipment.

7.  The Federal Satellite-Low ("FSL") is a low security facility with a single-fenced perimeter, cubicle housing, and strong work and program components. The FSL is a large dormitory that is divided into sections with double bunks inside cubicles.  There are two areas that have communal showers and bathrooms.  There are tables in the front of the dormitory for watching television.  There is also an area in front of the dormitory that has exercise equipment, law and leisure library, and offices.  Food services, psychology services, medical, education and visiting is in a separate building.  As of May 4, 2020, the FSL houses 131 female offenders. The rated capacity of the FSL is set at 198 inmates. The "rated capacity" is not a figure which represents the maximum number of inmates that can be designated to FSL Danbury.

### C.  BOP's Response to the COVID-19 Pandemic

8.  Before discussing the steps being taken at FCI Danbury, I will first discuss the phases of the BOP's national response to the COVID-19 pandemic, which apply generally across all BOP institutions. As set forth below, the Bureau has taken—and is continuing to take— significant measures in response to the COVID-19 pandemic in order to protect the safety and security of all staff and inmates, as well as members of the public.

9.  In January 2020, BOP became aware of the first identified COVID-19 cases in the United States and took steps to prevent its introduction and spread in BOP institutions, including FCI Danbury.

10.  To date, BOP's response to COVID-19 has occurred over six distinct phases.

### D.  Action Plan for COVID-19, Phase One

11.  In January 2020, the Bureau began Phase One of its Action Plan for COVID-19.  Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission. See https://www.bop.gov/resources/news/20200313_covid-19.jsp. In addition, an agency task force was established to begin strategic planning for COVID-19 Bureau-wide. This

strategic planning included building on the Bureau's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan. From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the Office of the Vice President. See https://www.bop.gov/resources/news/20200313_covid-19.jsp.

### E. Action Plan for COVID-19, Phase Two

12. On March 13, 2020, the Bureau implemented Phase Two of its Action Plan. Phase Two put into place a number of restrictions across all Bureau facilities over a 30-day period, to be re-evaluated upon the conclusion of that time period. Specifically, the Bureau suspended the following activities for an initial period of 30 days, with certain limited exceptions: social visits; legal visits; inmate facility transfers; official staff travel; staff training; contractor access; Volunteer visits; and tours.

13. During Phase Two, inmates were subjected to new screening requirements. Specifically, all newly arriving Bureau inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any high-risk COVID-19 locations (as determined by the CDC), or had had close contact with anyone testing positive for COVID-19. Asymptomatic inmates with exposure risk factors were quarantined, and symptomatic inmates with exposure risk factors were isolated and evaluated for possible COVID-19 testing by local Bureau medical providers.

14. Staff were also subjected to enhanced health screening in areas of "sustained community transmission," as determined by the CDC, and at medical referral centers. On March 25th, 2020, FCI Danbury implemented this enhanced screening for staff and contractors. The enhanced screening measures required all staff to self-report any symptoms consistent

with COVID-19, as well as any known or suspected COVID-19 exposure, and further required all staff to have their temperature taken upon entry into any Bureau facility.

15. Finally, in addition to the measures listed above, the Bureau implemented national "modified operations" in order to maximize social distancing within Bureau facilities. These modifications included staggered meal and recreation times in order to limit congregate gatherings. Additionally, the Bureau established a set of quarantine and isolation procedures for known or potential cases of COVID-19.

### F. Action Plan for COVID-19, Phase Three

16. On March 18, 2020, the Bureau implemented Phase Three of the COVID-19 Action Plan for Bureau locations that perform administrative services (i.e., non-prison locations), which followed DOJ, Office of Management and Budget, and OPM guidance for maximizing telework. In this phase, individuals who had the ability to telework and whose job functions did not require them to be physically present were directed to begin teleworking.

17. Additionally, as part of this phase, and in accordance with the Pandemic Influenza contingency plan, all cleaning, sanitation, and medical supplies were inventoried.

### G. Action Plan for COVID-19, Phase Four

18. On March 26, 2020, the Bureau implemented Phase Four of its Action Plan. In Phase Four, the Bureau revised its preventative measures for all institutions. Specifically, the agency updated its quarantine and isolation procedures to require all newly admitted inmates to the Bureau, whether in areas of sustained community transmission or not, to be assessed using a screening tool and temperature check (further explained below). This screening tool and temperature check applied to all new intakes, detainees, commitments, prisoners returned on writ from judicial proceedings, and parole violators, regardless of their method of arrival. Thus, all new arrivals to any Bureau institution—even those who were asymptomatic—were placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates were placed in isolation until they tested negative

for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.

### H. Action Plan for COVID-19, Phase Five

19. On March 31, 2020, the Director of the Bureau ordered the implementation of Phase 5 of its COVID-19 Action Plan, which took effect on April 1, 2020. Specifically, the Director ordered the following steps to be taken:

   a. For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

   b. During this time, to the extent practicable, inmates should still have access to programs and services offered under normal operating procedures, such as mental health treatment and education.

   c. In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

   d. After 14 days, this decision will be re-evaluated and a decision made as to whether or not to return to modified operations.

   e. Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Computer System (TRULINCS ) access.

   f. Provided inmates access to programs and services offered under normal operating procedures, such as mental health treatment and education.

   g. In addition, the Bureau coordinated with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

   h. See https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

20. At FCI Danbury, during Phase Five, meals, commissary items, laundry, recreation materials, education materials, medical services and psychology services were delivered directly to inmates' housing units. Further, inmates were released from their cells in small groups to engage in activities such as showers, exercise, phone calls, and email access.

During these time periods, inmates have been directed to maintain appropriate physical distancing.

## I.  Action Plan for COVID-19, Phase Six

21. On April 13, 2020, the Director of the Bureau ordered the implementation of Phase 6 of its COVID-19 Action Plan.  Specifically, the Director ordered an extension of the nationwide action in Phase 5, which applies to medical screening, limited inmate gathering, daily rounds, limited external movement, and fit testing, until May 18, 2020. Phase Six has been implemented at FCI Danbury.

## J.  Adjustments to Institutional Operations in Order to Implement the COVID-19 Action Plan

22. FCI Danbury has implemented BOP's national action plan, in compliance with BOP's national directives.

23. The implementation of the BOP's COVID-19 Action Plans at FCI Danbury can best be described as a "slowing down" of institutional operations, designed to limit the size of groups inmates can form and also the ability of these smaller groups to interact with each other at FCI Danbury. This minimizes the opportunity for inmates to come into contact with infected persons, and if they do, minimizes the possibility that any infection will spread beyond the smaller group.

24. In general, the smaller inmate groups at FCI Danbury were formed by dividing inmates by housing unit, and if applicable floor, so they can 'shelter in place' with the fewest number of fellow inmates. In order to reduce idle time and provide programs and activities, these groups are rotated through the recreation facility by themselves, and disinfection of the recreation facility is performed before the next group is rotated through it. Programs are delivered on the units, to include Education, Psychology, and Religious Services (especially in consideration of the Ramadan observance). All meals are delivered on the units, inmates are still receiving at least one hot meal per day, and meal delivery to

the units is performed by staff (instead of inmate food service workers) in order to maintain the integrity of the inmate group quarantine. When inmates need to report to Health Services for activities which cannot be performed on the unit (medication administration, etc.), they report to the clinic only with other inmates from their group. Once at the clinic they move throughout the space in accordance with markings on the floor to direct one-way travel, and wait in areas designed to facilitate social distancing.

25. In addition, separate housing spaces have been established for "Isolation" (for inmates demonstrating symptoms) and "Quarantine" (asymptomatic) inmates. These areas are distinct from the aforementioned housing unit groups and identified with signs prior to entering the unit. Staff are required to utilize proper personal protective equipment ("PPE") prior to entering these units to minimize to potential for cross-contamination between units.

26. Finally, certain units have been set up to quarantine inmates who, in light of guidance regarding eligibility for release to home confinement under the expanded consideration authority granted to the Attorney General under the CARES Act, may soon be releasing to the community. In order to protect against the risk of transferring inmates to the community that will contribute to the spread of COVID-19, any inmate granted home confinement is placed in a 14-day quarantine prior to discharge from the BOP facility. These "home confinement quarantine" units are intended to minimize the amount of time an inmate might be required to stay in a pre-release quarantine should they become eligible for this benefit.

27. The FPC was placed on modified operations on March 19, 2020. This involved dividing the FPC into four separate dormitory groups, each of which moves throughout the facility by itself so there is no opportunity to have contact with the other dormitory groups. Each dormitory group has a designated shared bathroom and shower facility, eats in their assigned dormitory, and is allowed to use the recreation facilities only with inmates from their dormitory group. Due to the fact there have not been COVID infections at the FPC,

isolation and quarantine procedures have not been utilized at the FPC. Nonetheless, space in the Unicor warehouse and FCI has been designated to perform these functions should the need to isolate or quarantine FPC inmates arise.

28. The FSL was placed into modified operations on March 19, 2020. Housing at the FSL is a large dormitory that is divided into sections, with inmates assigned to live in cubicles containing bunks. Areas of the FSL not ordinarily used as housing have been repurposed in order to accommodate isolation and quarantine procedures; furthermore, recent COVID infections at the FSL have created a need to utilize the kitchen as a separate quarantine space. The visiting room at the FCI has also been used as a quarantine space for at-risk female inmates who were tested at the beginning of the emergency and are awaiting return to the FSL. The number of temporary quarantine spaces needed should be reduced as the different groups of inmates complete their quarantine periods (each established by the date the quarantine began) and can be reintroduced to the main living space at the FSL dormitory.

29. The FCI was placed into modified operations on March 19, 2020. This facility has standalone housing units for isolation, quarantine (such as for newly-committed inmates; these inmates do not go straight into the general population), and "home confinement quarantine". Any FCI inmate that requires isolation is placed in a single-occupancy cell with a solid door that locks. The auditorium has been set up for quarantine for home confinement inmates. The FCI also has a unit dedicated to those that are released from isolation to continue to recover before they are returned to a general population unit.

30. Should the need arise, each facility retains the ability to create new isolation/quarantine space. For example, the FCI has been able to repurpose auditorium space into a pre-release quarantine for inmates transferring to home confinement, and has preplanned turning the dormant Unicor (Federal Prison Industries) factory into temporary housing. The FPC has already converted space in the Unicor warehouse into cubicle housing, and two temporary buildings on loan from the United States Penitentiary in Lewisburg (PA) have been raised

should additional isolation/quarantine space be needed. Finally, the FSL has been able to repurpose classroom and activity space inside the facility into temporary living quarters in order to isolate/quarantine inmates. Additional temporary measures that have been taken include using the FCI visiting room as a quarantine facility for FSL inmates, and creating isolation cells inside the FCI for inmates from the FSL. I am not concerned that we will run out of appropriate space to isolate/quarantine inmates at FCI Danbury.

### K. Hygiene and Safety Practices at FCI Danbury

31. Maintaining institutional and personal hygiene is always a priority in a correctional setting. Since the COVID-19 pandemic however, institutional and personal hygiene has been elevated to the utmost importance, especially since inmates have been largely restricted to their housing units since implementing Phase Five of the COVID-19 Action Plan. Maintaining the highest standards of institutional and personal hygiene during modified operations is not only important for purposes of infection control, but also to minimize the possibility of disturbances or other events which might compromise the security and good order of the institution.

32. The Safety Department at FCI Danbury is responsible for distributing cleaning supplies throughout the institutions. These include but are not limited to cleaning chemicals, spray bottles, cleaning rags and applicators, and the equipment necessary to perform cleaning tasks. The chemicals used for cleaning at FCI Danbury are distributed to all areas of the institution on a regular schedule, and if any particular area requires additional cleaning supplies, staff assigned to that area can make arrangements with Safety to receive more. I am not aware of Safety ever having run out of cleaning supplies since the COVID-19 crisis began at FCI Danbury.

33. Currently, four specific cleaners are being used at FCI Danbury. TriBase 17 Multi-Purpose Cleaner, hdqC2 disinfectant cleaner, and Formula 66 air freshener have been the ordinarily employed cleaning chemicals at FCI Danbury. Since the beginning of the COVID emergency however, a broad spectrum disinfectant ("Virex II/256") has been

added to specifically address the coronavirus threat. Virex II/256 is now used throughout the institution.

34. Prior to this pandemic, chemicals used for cleaning at FCI Danbury were distributed throughout the institutions on a regular weekly and monthly schedule. In between the regularly-scheduled distribution, staff were always able to request additional cleaning supplies if they were needed.

35. Since the current emergency however, FCI Danbury has gone to a daily distribution of cleaning supplies. On weekdays an institution-wide announcement is made for staff to place their cleaning bottles outside the doors of their housing units, and Safety Department staff refill or replace needed supplies. While prior to the pandemic inmate orderlies would report to Safety to retrieve these supplies, in order to maintain the integrity to the group quarantine, staff now perform these functions. Of course, if additional supplies are needed during the day, staff can coordinate the delivery of these items with the Safety Department.

36. Once in the housing units, cleaning supplies are maintained in small caddies or bins kept in staff offices or closets. Inmates can then ask for a bin of cleaning supplies to bring back to their living areas.

37. Large area disinfection is being performed at both the FSL and FCI through use of backpack cleaning chemical sprayers. This work is performed by inmate orderlies or staff, depending on the location (inmates cannot perform this work in an area where they might come into contact with inmates not in their quarantine group). At this time five additional backpack sprayers are being routed to FCI Danbury from the BOP's Command Center, and this will greatly expand the ability to perform this task. Whether by backpack unit or spray bottles, inmate orderlies (working only within their unit, to maintain the integrity of the group quarantine) are cleaning all high-touch areas such as doorknobs, railings, knobs, and handles multiple times per day.

38. As a final measure intended to ensure all inmate living and activity areas are maintained in the cleanest possible condition, I have made each member of my Executive Staff individually responsible for overseeing the condition of specific housing units.

### L. The Availability of Soap and other Personal Hygiene Products

39. Inmates at FCI Danbury are provided with basic soap and personal hygiene products (razors, toothbrushes, toothpaste, etc.) by the institution. These toiletries are maintained by staff whose offices are located in the housing units, so there is never a reason an inmate should not have access to soap at FCI Danbury.

40. FCI Danbury also operates a centralized laundry, and inmates in this facility have their clothes (institution issued as well as personal articles purchased from commissary) washed for them by the laundry department. Inmates at both the FPC and FSL are provided with no-cost washers/dryers/laundry soap which they can use to clean clothes and linens.

41. Beyond that, the commissary at FCI Danbury allows inmates to purchase toiletries, medication, food, and other items not issued regularly as part of the institution administration. Similar to the offerings at any convenience store, the commissary at FCI Danbury offers a selection of up to 13 different soaps, to include familiar national brands such as Irish Spring, Dove, Pure Antibacterial, Noxzema, and Neutrogena. Inmates can also buy Ajax dish detergent and laundry detergent from the commissary. A complete list of items FCI Danbury inmates can buy is available on the BOP's public website and can be seen at https://www.bop.gov/locations/institutions/dan/dan_comlist.pdf.

42. My review of commissary records show that all four plaintiffs have had regular access to the commissary throughout this time, and all four regularly purchase soap and other personal hygiene products.

43. Since the beginning of the year inmate Martinez-Brooks has spent $391.10 at the commissary, to include purchasing Pure Antibacterial soap on three occasions (last purchased Pure Antibacterial Soap on April 2, 2020).

44. Since the beginning of the year inmate Cassidy has spent $567.20 at the commissary, to include purchasing various brands of soap on five occasions (last purchased Irish Spring Icy Blast on April 1, 2020).

45. Since the beginning of the year inmate Collier has spent $921.90 at the commissary, to include purchasing various brands of soap on ten occasions (last purchased Dove Soap on April 27, 2020).

46. Since the beginning of the year inmate Madore has spent $1187.65 at the commissary, to include twice purchasing bar soap (last purchased three bars of Pure Antibacterial soap on March 24, 2020).

### M. Status of Personal Protective Equipment

47. Staff and inmates at FCI Danbury have, and will continue to have, access to appropriate personal protective equipment ("PPE").

48. Upon reporting to work each day, staff at FCI Danbury are provided with new surgical masks at the staff screening site to wear throughout their shift. Staff are required to wear these masks, and failure to do so may be cause for employee discipline under terms of Program Statement 3420.11 Standards of Employee Conduct.

49. There are areas of the institution where staff might require additional PPE to perform their duties. These areas include but are not limited to Health Services, Receiving & Discharge, and isolation housing units. In these areas kits have been assembled which contain the enhanced PPE to be used in that area (for example, gown, gloves, N-95 particulate respirators, face shields) and are always available. When the number of kits gets low, staff contact Health Services and additional kits are provided. In addition, kits are maintained in other areas of the institution (Control Center, Lieutenant's Office) to ensure availability during all hours of the day.

50. Throughout the institution and while working posts at the outside hospital, Correctional Officers are provided with PPE appropriate for their assigned post.

51. Staff are instructed as to the proper use of PPE through various memoranda detailing the type of PPE required at a given post or for a specific duty. Memoranda have also been circulated to instruct staff as to the proper donning/doffing of PPE, and video instruction is also available on the computer desktop of every FCI Danbury employee.

52. Inmates at FCI Danbury were initially provided with two of the same surgical masks provided to staff. Once FCI Danbury was able to procure cloth masks, two of these masks were issued to every inmate. Upon request, inmates will still be provided with the same surgical masks provided to staff. Inmates are required to wear these masks at all times except when they are eating or sleeping, and failure to do so may make the inmate subject to discipline under Program Statement 5270.09 Inmate Discipline Program.

53. Inmates performing cleaning or orderly duties have always, and will continue, to have access to gloves or other PPE as may be necessary for them to perform their assigned duties.

### N. Staffing

54. FCI Danbury staff work and live in an area of the country where there has been widespread community transmission of COVID-19. Through communications from Bureau leadership, local Executive Staffs, and individual supervisors, staff have been informed how to perform regular self-monitoring for symptoms, practice social distancing and to disinfect and clean their work spaces. Anyone who develops signs or symptoms of illness is sent home.

55. Beginning on or about March 25, 2020 staff at FCI Danbury were subjected to enhanced health screening prior to the start of their shift. These enhanced screening measures involve every staff member reporting to a screening site prior to the start of their shift, where they are required to self-report any symptoms consistent with COVID-19 as well as any known or suspected COVID-19 exposure, and further required to have their temperature taken. Staff are not permitted to report to their post without first reporting to the staff screening site.

56.  If a staff member reports symptoms consistent with COVID-19 or a known or suspected COVID-19 exposure, or registers a temperature of 100.4 degrees or higher, they are sent home. A BOP medical officer will then contact them and determine when it would be safe and appropriate for them to return to the institution.

57. If a staff member has been determined to be positive for COVID-19 following a laboratory test, the following criteria is used to assess their suitability for returning to work:

    a.  At least 3 days (72 hours) need to have passed since recovery (defined as resolution of fever without the use of fever-reducing medications); and,

    b.  Improvement in respiratory symptoms (e.g., cough, shortness of breath); and,

    c.  At least 7 days have passed since symptoms first appeared.

58. If a staff member has been identified as a prolonged close contact of a COVID-19 positive case, and did not have the appropriate PPE or had a breach in their PPE, as long as the staff member remains asymptomatic, they:

    a.  Return to work for their regular shift,

    b.  Are required to undergo temperature monitoring and symptom checks upon arrival to work, and are also instructed to perform self-monitoring at home; and,

    c.  Are instructed to immediately stop work, notify their supervisor, and isolate at home if symptoms consistent with COVID-19 (e.g., fever, cough, or shortness of breath) develop; and,

    d.  Are directed to quarantine themselves when not at work for a period of 14 days

59. If a staff member at FCI Danbury is symptomatic or becomes symptomatic, they:

    a.  Are not allowed to report to work; and

    b.  Are required to give notice to their Supervisor; and

    c.  Are directed to notify their local Health Department or their personal healthcare provider.

### O.  The BOP's Authority to Place Inmates on Home Confinement

60. The BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C.
§ 3624(c) (2) and 34 U.S.C. § 60541.  The BOP's policy and procedures regarding home
confinement are outlined in BOP Program Statement 7320.01, Home Confinement and
BOP Operations Memorandum, Home Confinement under the First Step Act, both of
which are available on www.bop.gov via the Resources tab.  Both statutes set forth certain
limitations with respect to the BOP's transfer authority.  See 18 U.S.C. § 3624(c) (2) and
34 U.S.C. § 60541.  However, pursuant to the Attorney General's directives in light of the
COVID-19 pandemic, dated March 26, 2020, and April 3, 2020, infra, and given the surge
in positive cases at select sites, the BOP began immediately reviewing all inmates who
have COVID-19 risk factors, as described by the Centers for Disease Control and
Prevention (CDC), to determine which inmates are suitable for home confinement.  Since
the release of the Attorney General's original memorandum dated March 26, 2020, the
BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate
response to the COVID-19 pandemic. FCI Danbury is following this guidance.

### P.  The Attorney General's Memorandum for the Director of the Bureau of Prisons, dated March 26, 2020

61. On March 26, 2020, the Attorney General issued a Memorandum for the Director of the
Bureau of Prisons (the March 26, 2020, Memorandum) to ensure that, in light of the
COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the
health and safety of BOP personnel and people in BOP's custody.  Pursuant to the March
26, 2020, Memorandum, BOP is prioritizing the use of its statutory authorities to grant
home confinement for inmates seeking transfer in connection with the ongoing COVID-
19 pandemic.  It was noted in the March 26, 2020, Memorandum that many inmates will
be safer in BOP facilities where the population is controlled and there is ready access to

doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

62. In assessing whether home confinement should be granted pursuant to the March 26, 2020, Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

    a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

    b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

    c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

    d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment;

    e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

    f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

63. In addition to setting forth these factors, the March 26, 2020, Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone

he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement.  The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.  The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

64. Moreover, the March 26, 2020, Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

### Q.  The CARES Act and the Attorney General's Memorandum for the Director of the Bureau of Prisons, dated April 3, 2020

65. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020, Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

66. The April 3, 2020, Memorandum specifically stated that the BOP must move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

67. The April 3, 2020, Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020, Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

68. For inmates deemed suitable candidates for home confinement, the April 3, 2020, Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility. The April 3, 2020, Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred. The assessment of all inmates remain guided by the factors in the March 26, 2020, Memorandum.

69. The April 3, 2020, Memorandum also recognized the BOP has limited resources to monitor inmates on home confinement and the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance doing so is appropriate and consistent with the obligation to protect public safety.

70. Lastly, the April 3, 2020, Memorandum stated it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

**R.  The BOP's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda**

71. The BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country.  The BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program.  The BOP is then processing those inmates for transfer as expeditiously as possible.

72. The BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives.

73. The BOP has increased home confinement by over 69.1% since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020, Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 1972 inmates on home confinement.

74. Inmates do not need to apply to be considered for home confinement.  BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

75. It should be noted for public safety reasons, in accordance with the March 26, 2020, Memorandum and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing a number of factors to ensure an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring the inmate has a verifiable release plan; verifying the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

76. In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentence, or (2) have 18 months or less remaining in their sentence and have served 25% or more of their sentence. As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

77. If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.

78. Staff at FCI Danbury have been reviewing inmates for home confinement since the Attorney General's March 26 guidance was issued. Because this guidance has changed several times (in some cases causing inmates to be reviewed more than once), an exact number of inmates that have been reviewed is impossible to arrive at. However, with the assistance of my Case Management Coordinator I can estimate that approximately 159 FCI Danbury inmates have been reviewed for home confinement since March 26. These reviews have led to 21 FCI Danbury inmates having been released to home confinement,

with another 2 having been released on furlough until the beginning of a previously-established home confinement date.

### S. Testing

79. FCI Danbury is conducting COVID-19 testing in accordance with CDC guidelines. The CDC has explained that not everyone needs to be tested for COVID-19, and decisions about testing are at the discretion of state and local health departments. See www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html (last visited on Apr. 30, 2020).

80. This petition alleges "FCI Danbury has further willfully refused to take temperatures or test for fever in order to avoid identifying cases of possible COVID infection." Pet. at ¶132. This could not be further from the truth. In fact, beginning on April 9, 2020, FCI Danbury instituted daily temperature checks for all inmates. The Lieutenants at FCI Danbury have been provided with infra-red no-touch thermometers to perform this task, and every day they visit each housing unit to take the temperature of all inmates assigned to that unit. If in the course of performing these checks any inmate is found to have a temperature of 99 degrees or higher, Health Services staff are contacted and the inmate is sent for a follow-up assessment to be performed by a licensed health care provider.

81. Any inmate at FCI Danbury presenting with symptoms consistent with COVID-19 is immediately evaluated by a medical provider to determine whether testing and/or isolation is appropriate. Furthermore, the symptomatic inmate's circumstances are reviewed to determine whether contact tracing might be necessary, and whether inmates with whom the symptomatic inmate had contact might need to be quarantined.

82. At FCI Danbury the decision whether to test an inmate for COVID-19 is made by BOP medical providers based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk." On April 14, 2020, FCC Danbury received an Abbott "ID NOW" machine that can deliver positive or negative test results for

COVID-19 infection in approximately 15 minutes. As of this date, FCI Danbury has 150 COVID-19 testing kits in stock. Danbury also has the ability to order and quickly receive additional kits from a designated vendor if needed.

83. Since the advent of the emergency, 205 inmates have been tested for COVID-19. Sixty-nine inmates and 56 staff have tested positive for COVID-19.

84. Since BOP entered Phase One of its COVID-19 Action Plan, inmates at FCC Danbury have continued to have access to "sick call", which is a means by which inmates can request to be seen by a BOP health care provider. There has been no change in the "sick call" policy since the COVID-19 pandemic began.

85. During the week of April 25, 2020, the office of Senator Christopher Murphy reached out to FCI Danbury to discuss testing of inmates at FCI Danbury. Between May 2-3, 2020, every FSL inmate was tested using the Abbott "ID NOW" machine. During this period, 143 tests were performed, and 20 inmates tested positive for COVID-19.

### T.  Medical Services at FCI Danbury

86. The Health Services department at FCI Danbury is staffed with both civilian health care providers and uniformed officers from the Commissioned Corps of the United States Public Health Service ("USPHS"). In total, the Health Services department at FCI Danbury consists of one Health Services Administrator, two physicians, one part-time Mid-Level Provider, one pharmacist, one IOP/ID Registered Nurse, one Registered Nurse, three Emergency Medical Technician-Paramedics, one dentist, one dental hygienist, one licensed clinical social worker, one medical records technician, one health services administrative assistant, three contract medical assistants, one contract phlebotomist, and one contract x-ray technician.

87. Since the COVID-19 emergency began, three BOP and two contract Health Services staff were placed on leave due to testing positive for COVID-19. Prior to the COVID-19 emergency two staff members were on medical leave status and one had been granted paternity leave. Due to these absences, the BOP's Northeast Regional Office ("NERO")

sent a Medical Asset Support Team ("MAST") to assist FCI Danbury with its COVID-19 response. This MAST includes an Associate Warden, two Physician Assistants, and one pharmacist.

88. In order to take 100% of staff temperatures every day, a screening site has been set up in the front lobby of the institution. When staff report to work they are asked a series of screening questions regarding their health and their temperature is taken. Only staff whose temperatures are 100.3 degrees or less are allowed to proceed to their duty station.

89. The Lieutenants at FCI Danbury have been provided with infra-red no-touch thermometers to ensure the entire inmate population has their temperature taken every day. This task is accomplished by having the Lieutenants daily visit each housing unit to take the temperature of all inmates assigned to that unit. If in the course of performing these checks any inmate is found to have a temperature of 99 degrees or higher, Health Services staff are contacted and the inmate is sent for a follow-up assessment to be performed by a licensed health care provider.

90. As noted previously, inmates have always had access to Health Services throughout the period of modified operations. In order to maintain the integrity of the group quarantines, Health Services staff (which have included the social worker and/or the dental hygienist) go to the individual housing units to pass out and collect "sick call forms", which are written requests to Health Services staff. The staff distributing and receiving these forms do not perform assessments at that time. The "sick call" forms are triaged by a Registered Nurse and/or a Physician Assistant for appropriate action. If it is determined an inmate needs to be seen in the clinic, they are set for an appointment at a time they can move to the clinic with other members of their quarantine group. For emergent medical needs, an inmate can always be specifically called up to the clinic outside the pre-planned "move" or scheduled quarantine group visits.

91. All inmates who present with COVID-19 symptoms are isolated and tested the same day, provided testing supplies are available. Under no circumstances are inmates that have been

Case 3:07-cr-00565-CKE Document 29-1 Filed 05/07/20 Page 25 of 27
Case 3:20-cv-00569-MPS Document 341-2 Filed 05/08/20 Page 27 of 54

placed in isolation released to the general population prior to meeting the CDC's symptom-based criteria for appropriateness, which includes (1) being fever-free for greater or equal to 72 hours without the use of fever-reducing medication, and (2) respiratory symptoms have improved, and (3) at least 7 days have passed since the first symptoms appeared. When an FCI Danbury inmate is receiving treatment for COVID-19 at the outside hospital, Health Services staff engage in daily contact and consultation with the community based infectious disease specialists providing the treatment.

92. The pharmacy at FCI Danbury has remained functioning throughout this period of modified operations. Whenever possible, inmates "self-carry" their medications, meaning they are allowed to maintain their prescription medications in their property and are responsible for taking the medication themselves. Otherwise, there are two scheduled "moves" per day when inmates can, within their quarantine group, proceed to the clinic for "pill line" or staff-assisted medication administration.

**U. Compassionate Release / Reduction in Sentence Procedures**

93. The First Step Act specifies an inmate may file a Motion for Reduction of Sentence ("RIS") directly in the sentencing court after exhaustion of administrative remedies, or 30 days from the date the warden receives such a request from the inmate, whichever is earlier. See 18 U.S.C. § 3582(c) (1) (A).

94. Staff at FCI Danbury are receiving and processing requests for a Reduction in Sentence/Compassionate Release as quickly as possible. Indeed, since this emergency began the RIS Coordinator at FCI Danbury has received 241 requests for this benefit. As of May 4, 2020, 136 completed requests have been processed and denied, 18 have been returned to the inmate seeking further information, 70 are processing through the various staff who need to review the application, and 17 are awaiting my review.

95. As to plaintiffs, my review of records shows inmate Martinez-Brooks made an incomplete request for RIS on March 26, 2020, and only submitted a complete request on April 24, 2020. This request has not yet been reviewed. Inmate Collier made an initial request on

April 15, 2020, although it was returned to her on April 24th to perform corrections necessary for it to be reviewed. Inmate Cassidy filed a RIS request on April 4, 2020, and this request was denied on April 22, 2020. As of this date, inmate Madore has not filed a request for RIS with my office.

### V.     Inmate Access to the Administrative Remedy Process

96. Plaintiffs allege staff at FCI Danbury are refusing to allow inmates to access to the administrative remedy process, set forth at 28 C.F.R. §542 Subpart B, since the COVID-19 emergency began. I specifically deny this allegation. In fact, my review of SENTRY (the BOP's computerized inmate management program which contains, among other things, a record of every grievance filed by any inmate throughout the agency) shows that inmates have filed 48 formal written Administrative Remedy Requests with my office between the dates March 1, 2020, - May 2, 2020. Thirteen of these Administrative Remedy Requests were requesting compassionate release or home confinement. As a matter of comparison, SENTRY shows the Warden's office received 61 formal written Administrative Remedy Requests during this same time period in 2019, 37 formal written Administrative Remedy Requests during this same time period in 2018, and 33 formal written Administrative Remedy Requests during this same time period in 2017.

# Left Blank Intentionally

97. As to plaintiffs, my review of SENTRY shows none of them have filed grievances since the COVID emergency began. Inmate Collier's most recent grievance was a filing made with BOP's Northeast Regional Office on March 9, 2020, appealing an "access to exercise equipment" complaint she filed with the Warden on January 10, 2020 (prior to modified operations). Inmate Martinez-Brooks' most recent grievance was filed in August 2019, at which time she was appealing the denial of a lower bunk pass. Inmate Cassidy's most recent grievance was filed during a prior term of incarceration, in September, 2007 while incarcerated at FCI Fort Dix (NJ), he requested an institutional transfer. Inmate Madore has never filed a grievance regarding any matter whatsoever while in BOP custody.

I declare the foregoing is true and correct to the best of my knowledge and belief, and given under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed this ____5____ day of May, 2020.

D. Easter

Digitally signed by D. Easter
Date: 2020.05.05 15:14:07
-04'00'

Diane Easter
Warden
FCI Danbury, CT

Page 27 of 27