**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| MICHAEL DELBUONO | : | No. 07-677-01 |
| | : | |

## MEMORANDUM

PRATTER, J.                                                                AUGUST _17_, 2020

Defendant Michael Delbuono seeks his immediate release from incarceration by moving

for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The primary basis for the

motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may

affect this defendant, who suffers from asthma and obesity. The Government disputes the merits

of the motion. The Court held, via videoconference on July 23, 2020, an evidentiary hearing and

oral argument regarding Mr. Delbuono's motion. For the reasons that follow, the Court denies the

motion.

### BACKGROUND

**I.      Mr. Delbuono's Criminal Conduct**

On approximately a dozen different occasions from June 2007 through October 2007, Mr.

Delbuono, the leader of a heroin-distribution conspiracy, and his co-conspirators sold bundles of

heroin to an undercover officer in South Philadelphia. Each bundle contained about 13 small bags

of heroin. In total, Mr. Delbuono and his co-conspirators sold more than 1,000 of these bags of

heroin, amounting to a total weight of 32.48 grams.

Mr. Delbuono committed these offenses while on federal supervised release and on New

Jersey state parole. In fact, Mr. Delbuono's first transaction charged in the indictment occurred

1

less than 1 week after his release from custody. Despite being required pursuant to the terms of his federal supervised release and his New Jersey state parole to restrict his travel to New Jersey, Mr. Delbuono committed the offenses at issue in South Philadelphia.

In October 2007, a grand jury returned a 12-count indictment charging Mr. Delbuono and his co-conspirators with drug offenses. In March 2008, Mr. Delbuono plead guilty before Judge Norma Shapiro to the charges in an "open" plea. Mr. Delbuono's conviction constituted a violation of his supervised release in two earlier federal heroin distribution cases, Cr. No. 01-458 and Cr. No. 04-684. In the former, Judge Petrese Tucker sentenced Mr. Delbuono to 12 months' incarceration, to be served consecutively to his sentence in this case. As for the latter, Judge Michael Baylson sentenced Mr. Delbuono to 12 months' incarceration, to be served consecutively to his sentence in this case, and 24 months' supervised release.[1] Mr. Delbuono will not begin to serve these sentences until he has completed the sentence imposed in this case. In August 2008, Judge Shapiro sentenced Mr. Delbuono to 230 months' incarceration to be followed by 6 years of supervised release.

Mr. Delbuono, now 46 years old, is currently serving his sentence at FCI Danbury with an anticipated release date of October 16, 2025.[2] This anticipated release date reflects the combined term for the sentence imposed for the instance offenses, the sentences imposed upon revocation of supervised release in Mr. Delbuono's two prior federal cases, and anticipated good time credit. Since being incarcerated for the instant offenses, Mr. Delbuono has had three disciplinary

---

[1] Because neither Judge Tucker nor Judge Baylson stated whether their violation of supervised release sentences were to be served concurrently with each other, these sentences must be served consecutively to one another. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.").

[2] This date reflects the award of anticipated good time credit. Absent this award, Mr. Delbuono's full term on all three sentences would expire on December 2, 2028.

infractions.[3]  While incarcerated, Mr. Delbuono has sought work and education and participated in a suicide-prevention program.

## II.     Mr. Delbuono's Medical Records

Mr. Delbuono's medical records reveal that he has had four clinical encounters while incarcerated at FCI Danbury.  Mr. Delbuono visited medical for a "Chronic Care" evaluation on November 15, 2019; an eye exam on March 31, 2020; a COVID-19 test on May 27, 2020; and a sick call for lower extremity pain on July 20, 2020.[4]

During the November 15, 2019 clinical encounter, medical personnel tested Mr. Delbuono's blood oxygen saturation rate, which, measuring at 99%, was considered excellent, as well as his Wright peak flow, which fell approximately within normal limits.  The medical records for this visit also reveal that Mr. Delbuono experienced no wheezing or shortness of breath and had a recorded body mass index of 30.6.  During this visit, Mr. Delbuono reported a childhood history of asthma.  He was given an Albuterol inhaler to use as needed, and to be replaced when empty.  This inhaler has 200 puffs.  If used at its maximum dosage—two puffs four times a day— it lasts 25 days.  Mr. Delbuono's medical records reflect that Mr. Delbuono received a renewed prescription for an inhaler on May 1, 2020.  This renewed prescription included a notation identical to Mr. Delbuono's prior prescription for his inhaler: "Don't use daily.  Inhale two puffs by mouth four times a day as needed to prevent/relieve asthma attack (inhaler to last 90 days.  If need more make sick call)".  Def.'s Med. R. at 5, 24[5] (Doc. No. 304).

---

[3]     Specifically, he committed a code 398 violation—interference with staff in the performance of duties—in 2008 and code 325 violations—giving or accepting money or anything of value to/from another inmate—in 2012 and 2014.

[4]     Mr. Delbuono asserts that he must have made at least 12 sick calls that were never documented.

[5]     This Memorandum refers to the pagination generated by the Court's Case Management/Electronic Case Files system.

The May 27, 2020 clinical encounter was prompted by the Bureau of Prisons' (BOP) decision to test the entire housing unit for COVID-19. Mr. Delbuono tested negative for COVID-19. During the May 27, 2020 and July 20, 2020 encounters, Mr. Delbuono's blood oxygen saturation rate again measured at 99%. During the July 20, 2020 clinical encounter, Mr. Delbuono's pulmonary function was also noted as within normal limits.

### III.     FCI Danbury's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority",[6] BOP has taken significant measures to protect the health of the inmates in its charge. As demonstrated in the comprehensive declaration of Diane Easter, the warden of FCI Danbury, FCI Danbury is implementing BOP's national action plan in accordance with BOP's national directives. In sum, Ms. Easter's declaration demonstrates that FCI Danbury has taken many measures to address COVID-19 and mitigate the risk of transmission, including implementing enhanced cleaning and sanitizing measures and procedures; conducting staff and inmate screening, which includes daily temperature checks for inmates; requiring staff and inmates to wear masks; and modifying facility operations so that inmates are essentially sheltering in place alongside their assigned housing units, receiving meals in their housing units, and receiving services and recreation solely with members of their housing units.

BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited July 29, 2020). The protocol set forth in this plan established a six-phase framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i.

---

[6]     BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited July 29, 2020).

This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Beginning April 13, 2020, Phase Six, which is an extension of Phase Five, has been implemented at FCI Danbury. Phase Five required all inmates in every BOP institution to be secured in their assigned cells/quarters. Pursuant to Phase Five, group gathering is permitted to facilitate commissary, laundry, showers, telephone, and computer access. Excluding medical treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. At FCI Danbury, commissary items, laundry, recreation materials, education materials, medical services, and psychology services are delivered directly to inmates' housing units during Phase Five. Inmates at FCI Danbury have only been released from their cells in small groups in order to engage in activities such as showering, exercising, making phone calls, and accessing emails. During these time periods, inmates are directed to maintain appropriate physical distancing. Moreover, official staff travel has been cancelled, as has most staff training.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or

runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection.

FCI Danbury distributes cleaning supplies such as cleaning chemicals, spray bottles, cleaning rags and applicators, and necessary equipment on a daily basis. Inmate orderlies or staff are performing large area disinfection through the use of backpack cleaning chemical sprayers. Doorknobs, railings, knobs, handles, and other high-touch areas are cleaned multiple times per day. Moreover, staff and inmates at FCI Danbury have, and will continue to have, access to appropriate personal protective equipment. Staff are provided with new surgical masks each day, which they are required to wear. Although inmates at FCI Danbury were initially provided with two of the same surgical masks provided to staff, FCI Danbury has since issued two cloth masks to every inmate. Except when eating or sleeping, inmates are required to wear their masks at all times.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[7] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General

---

[7] This authority includes the ability to place an inmate in home confinement during the last 6 months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

Unfortunately, some inmates and staff at various institutions have become ill. As of May 19, 2020, the date in which the Government filed its response in opposition, 34 inmates and three staff members tested positive for COVID-19 at FCI Danbury, amounting to one inmate death and no staff deaths. As of July 23, 2020, the date in which an evidentiary hearing and oral argument was held, there have been no additional inmate or staff deaths. Only one inmate has currently tested positive, whereas 89 inmates and 61 staff have since recovered.

### LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[8]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction and that the reduction is consistent with the Sentencing Commission's

---

[8]     According to Mr. Delbuono, his attorney sent a letter dated April 6, 2020 to Ms. Easter and the Director of the BOP requesting that BOP either transfer Mr. Delbuono to home confinement or file a motion for compassionate release on his behalf. Apparently, the BOP did not respond. Although the Government contends that BOP has no record of this request, the Court need not focus its analysis further on this requirement because the Government does not raise an exhaustion argument.

applicable policy statements[9] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.(1)(A)(ii). In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense,

---

[9]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded that "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899) (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

## DISCUSSION

Mr. Delbuono moves to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). He contends that he suffers from asthma and that the conditions at FCI Danbury prevent social distancing. He also points out that while incarcerated, he has dedicated himself to his rehabilitation, received various commendations, taken various educational programs, and worked in a Unicor manufacturing job. He also asserts that he has already served a significant portion of his release. In his supplemental submission, he asserts that his level of obesity, which the CDC only very recently acknowledged as a COVID-19 risk factor, further supports his request.

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[10] frequent and thorough hand-washing, avoidance of close

---

[10]     Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Delbuono's motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Delbuono contends that his risk of contracting COVID-19 presents an extraordinary and compelling reason to reduce his sentence. The Court disagrees.

The CDC recognizes that "moderate to severe asthma" *may* pose a risk of an adverse outcome of COVID-19.[11] Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

> Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
>
> Symptoms interfere with daily activities.
>
> Nighttime symptoms occur more than 1 time a week, but do not happen every day.
>
> Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited July 29, 2020). Mr. Delbuono's medical records reveal that his use of his inhaler is minimal and that there is an absence of documentation showing that he meets the definition described above for moderate asthma. Mr. Delbuono's medical records also reveal that during his relatively short tenure at FCI Danbury, the facility has appropriately responded to his medical needs, including filling a renewed prescription

---

[11] This is in contrast to a number of conditions that the CDC represents present a *definite* risk.

for his inhaler on May 1, 2020 and administering a COVID-19 test on May 27, 2020. Mr. Delbuono asserts that the facility has actually failed to address or document various sick calls he made related to his breathing problems. Despite Mr. Delbuono's assertions to the contrary, however, the Court finds that the submitted evidence demonstrates that FCI Danbury has indeed responded to Mr. Delbuono's medical requests and is more than able to provide him the medical attention needed to appropriately address his asthma. The Court finds no basis on which to question FCI Danbury's ability to continue providing this same level of care to Mr. Delbuono in the future. In sum, Mr. Delbuono's medical records suggest that he does not suffer from moderate to severe asthma and that FCI Danbury is capable of—and has been—providing the medical attention necessary to treat his asthma.

Mr. Delbuono has also recently asserted that his body mass index measurement of 30.6 demonstrates that he suffers from the additional risk factor of obesity. The CDC very recently reduced it danger threshold for obesity from a body mass index of 40 to one of 30. *See* CDC, *People        with        Certain        Medical        Conditions*,        available        at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 29, 2020). Pursuant to the CDC's recent reduction, Mr. Delbuono's obesity is now considered a factor that increases the risk of severe illness from COVID-19. Even so, the fact that Mr. Delbuono suffers from obesity during the age of the COVID-19 pandemic does not necessarily mean that extraordinary and compelling reasons justify the reduction of his sentence. *See United States v. D'Ambrosio*, No. 15-3, 2020 WL 4260761, at **4-5 (M.D. Pa. July 24, 2020) (denying motion to

reduce sentence submitted by defendant concerned about the transmission of COVID-19 who exhibited obesity and high blood pressure).

Although FCI Danbury had certainly experienced the severity of COVID-19 during the initial peaks of the transmission of the virus, the most recent data confirms that the facility is currently vigorously defending against a heightened outbreak and facilitating the recovery of infected individuals. Although the Court in no way trivializes the seriousness of Mr. Delbuono's health conditions, such ailments, coupled with the present conditions at FCI Danbury, do not represent extraordinary and compelling reasons which justify his early release. Therefore, the Court finds that Mr. Delbuono has failed to meet his burden in demonstrating that extraordinary and compelling reasons justify the reduction of his sentence.

Even if the Court were to find that extraordinary and compelling circumstances warranting a reduction of Mr. Delbuono's sentence exist, the Court must also then take into consideration the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A). The § 3553(a) factors militate against reducing Mr. Delbuono's sentence. When assessing these factors, the Court would be remiss if it failed to again stress FCI Danbury's ongoing efforts to protect inmates against contracting COVID-19, the fact that Danbury would treat any inmate who contracts COVID-19, and that Mr. Delbuono's medical conditions are appropriately handled at the facility. Moreover, Mr. Delbuono's history of drug trafficking, as well as his immediate resumption of drug trafficking upon his release from incarceration in 2008, necessitated a sentence that appropriately reflected the severity of the offense, the promotion of respect for the law, and protection of the public from the dangers of heroin. Similarly, Mr. Delbuono's history of and immediate resumption of drug trafficking upon his release prevents the Court from finding that he is not a danger to the safety or any other person to the community. Accordingly, the Sentencing Commission's relevant policy statement further

12

warns against granting Mr. Delbuono's request.  The Court also notes that a significant amount of time remains on Mr. Delbuono's sentence and that he cannot begin to serve his sentences imposed by Judges Tucker and Baylson until he completes the sentence at issue in this motion.

Therefore, the Court finds that Mr. Delbuono has failed to meet his burden in demonstrating that the Court should reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

### CONCLUSION

For the foregoing reasons, the Court denies Mr. Delbuono's motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate Order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

13